UNITED STATES, Appellee,

v.

Chester W. COLLIER, Staff Sergeant, U. S. Air Force, Appellant.

No. 29,915.

U. S. Court of Military Appeals.

March 26, 1976.

*Major John A. Cutts, III,* argued the cause for Appellant, Accused. With him on the brief were *William P. Homans, Jr.,* Esquire and *Colonel William E. Cordingly.*

*Lieutenant Colonel George L. Frederick* argued the cause for Appellee, United

States. With him on the brief were *Colonel C. F. Bennett, Colonel Julius C. Ullerich, Jr., Captain Alvin E. Schlechter*, and *Captain Frederick P. Waite.*

## OPINION

COOK, Judge:

A general court-martial convened at Seymour Johnson Air Force Base, Goldsboro, North Carolina, convicted the accused of two murders and three specifications of assault with intent to murder, in violation of Articles 118(2) and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 918(2) and 934, respectively. Review was granted by this Court to consider two issues, one dealing with the admission into evidence of a rifle obtained from the accused and the other with the admissibility of an oral, pretrial statement by him.

About 9:30 a. m. on Sunday, June 24, 1973, an unidentified man entered the emergency room of the base hospital with a rifle and indiscriminately fired at persons in the room. Two persons were killed and three were wounded. That evening, the accused and his wife were separately questioned at the Office of Special Investigations by military and state law enforcement agents. The accused admitted, as hospital records indicated, that he had visited the emergency room some time before the shooting. OSI Agent Jones testified that, at the time, he did not regard the accused as a suspect, and the accused was not advised of the right to remain silent. Considering the matters known to Jones, the Court of Military Review concluded that the agent "had reasonable cause to believe the accused had committed the crime under investigation," and therefore he was required "by law" to have advised the accused of his right to remain silent and to have counsel present at his interrogation. *United States v. Collier*, 49 C.M.R. 719, 724 (A.F.C.M.R.1975); *cf. United States v. Henry*, 21 U.S.C.M.A. 98, 44 C.M.R. 152 (1971). What the accused said was not offered in evidence at trial, but the court concluded, quite correctly, that consideration had to be given to whether the improperly obtained

statements tainted the accused's later delivery of the rifle to other agents and a statement made by him at an interrogation on June 29. *United States v. Troy*, 22 U.S.C. M.A. 195, 46 C.M.R. 195 (1973).

At approximately 3:00 p. m., June 25, the accused responded to a call from OSI and appeared for an interview at that office on the base. As the military and civilian authorities were still proceeding jointly with the investigation, Special Agent Lacadie, Air Force OSI, and Special Agent Keller, North Carolina State Bureau of Identification, talked to the accused. The accused, Lacadie, and Keller differ in their respective accounts as to what transpired at the interview. For present purposes, I need not review the differences. Suffice it to note Lacadie and the accused agree that, after the accused was informed of his right to remain silent and his right to counsel and agreed to waive them, the interrogation "started" with consideration of the accused's purchase of ammunition at the base exchange. The accused's direct testimony bearing on the question of taint is as follows:

Q. Were you advised of your rights at that time?

A. Yes, sir.

Q. What was your response upon being advised of your rights?

A. Mr. Lacadie asked me if I understood what he read and I said, "Yes, sir"; he asked me would I talk to him at that time, and I said, "Yes, sir"; and he asked me did I want an attorney present at that time and I told him no.

Q. Did he mention anything to you concerning any statements you made on the day before?

A. Not right then; it was after he asked me about the rifle and about the ammunition.

Q. How did he start his discussion with you?

A. He said—Mr. Lacadie speaking— he said, "We notice you bought ammunition from the Base Exchange," and I said, "Yes"; he then asked the question, "Do

you own a .22 caliber weapon?", and I said, "Yes, sir"; he said, "Can we get the weapon so we can eliminate you as a suspect?"; and I said, "Yes, sir."

On cross-examination, the accused conceded he was not "upset" or bothered at this interview by the statements he had made on June 24.[1] He reaffirmed that he had "voluntarily answer[ed] questions about the gun."

With an intermediate stop at the hospital to point out where he had parked on June 24, the accused proceeded to his own house. While the agents remained at the doorway, the accused "went into another room" and, within a minute, returned with a rifle, remarking, "This is the one, and it is loaded." Later, a ballistics expert determined that markings on test bullets fired from the rifle matched those of a bullet recovered from the body of one of the persons killed at the hospital.

At trial, defense counsel contended that the accused's statements to Special Agent Jones on June 24 were "used by Agents Lacadie and Keller to obtain the rifle." The contention was rejected by the trial judge, and his ruling was affirmed by the Court of Military Review. I also perceive no merit in it.

■ Evidence obtained in violation of an accused's right to remain silent and right to be free from unreasonable search and seizure is excludable at trial as part of the Government's case in chief. Similarly, other evidence obtained by exploitation of the illegally obtained evidence is inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Armstrong*, 22 U.S.C.M.A. 438, 47 C.M.R. 479 (1973); *cf. Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). However, the connection between the illegal evidence and evidence later obtained by the Government may be so attenuated that the taint of the former will not infect the latter, and, therefore, not subject it to the exclusionary rule.

■ The defendant in *Wong Sun* was subjected to an illegal search and seizure. Several days later, he voluntarily went to a police station. After being advised as to his right to remain silent and to consult counsel, he made a voluntary statement. The United States Supreme Court held that the illegality of the earlier search did not taint the statement. Recently, in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court held that the nexus between an illegal arrest and a statement made by the accused 2 hours later while still in police custody was not necessarily broken by advice to the accused at the threshold of the interrogation as to his right to remain silent and to the presence of counsel. In this case, nothing said by the accused on June 24 even hinted that he possessed a rifle. He conceded that, at the June 25 meeting with the agents, he was not "upset" by the earlier interview. I am convinced, therefore, there was no exploitive link between the improper interrogation on June 24 and the accused's delivery of the rifle on June 25.

I turn, next, to the contention that, having once indicated he wanted to remain silent at an interrogation sought by a Government agent, the accused could not again be interviewed in connection with the same offense. This aspect of the assignment of error is predicated upon the fact that shortly after the unwarned interrogation on June 24, the accused was advised of his rights, but was not questioned because he underscored the portion of the advice form tendered to him which read: "You have the right to remain silent."

■ In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court held that a defendant's ex-

---

1. In their versions of the June 29 interview, which is the subject of the second assignment of error, Lacadie and Keller testified that when the accused was asked why he had surrendered the rifle on June 25, he answered that he was "afraid he might do the same thing again." As the admissibility of the accused's statements at the June 29 interrogation is in dispute, I have disregarded this part of the testimony in consideration of the assignment of error relating to the rifle.

ercise of the right to remain silent at one interrogation does not immunize him from future interrogations. In that case, the defendant was arrested for robbery. The police attempted to interrogate him about the offense, but he refused to answer any questions and the interrogation ceased. About 2 hours later, other agents approached the accused about a criminal homicide. He was properly warned of, and waived, his right to remain silent and right to counsel. In the ensuing questioning, the defendant admitted complicity in the homicide. His statements were admitted in evidence at his trial for the homicide, and he was convicted. On appeal, the Michigan Court of Appeals held that once a defendant relies upon the right to remain silent, he cannot again be interrogated; on that basis, it concluded that the defendant's statement should have been excluded from evidence at trial. On certiorari, the Supreme Court overturned the State court's interpretation of the right to cut off police questioning, as the right was expounded in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court rejected as "absurd," a contention that once a defendant invokes his right to remain silent he can never again be asked to consent to interrogation. *Michigan v. Mosley, supra*, 96 S.Ct. at 325. The separateness of the two periods of interrogation in this case brings it within the ambit of *Mosley*. A different rule for the military was not established in *United States v. DeChamplain*, 22 U.S.C.M.A. 150, 46 C.M.R. 150 (1973), and *United States v. Attebury*, 18 U.S.C.M.A. 531, 40 C.M.R. 243 (1969). In each of those cases, while the accused was questioned on different occasions, it was the questioning after the accused's reliance on his right to silence at the interrogation that produced his statement which was held to be improper.

Left for consideration is the effect on the admissibility of the rifle of the accused's contention that, while he understood he had a choice about talking to the agents, he "thought . . . [he] didn't have any choice" about giving them the rifle. His contention is specifically opposed by Agent Lacadie, who testified: "We told him we would like to have . . . [the rifle] but he did not have to give it to us." [2]

In *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973), the Supreme Court held that whether an individual has "knowledge of the right to refuse consent" to a search is only "one factor to be taken into account" in determining the voluntariness of his consent. It also expressly ruled that the Government is not required to establish, affirmatively, that a suspect knew he had the "right to refuse consent . . . [to a search as] a necessary prerequisite to demonstrating a 'voluntary' consent." *Id.* at 232–33, 93 S.Ct. at 2050. The court specifically declined to hold that a request for consent to search is so similar to a request to submit to questioning as to require preliminary advice regarding the right to refuse. In *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the court applied the rationale of *Schneckloth* to an accused in custody so that no separate threshold advice as to the right to refuse consent to a search was necessary, in addition to the preliminary advice required in *Miranda* as to the right to remain silent and right to counsel. *See also United States v. Rushing*, 17 U.S.C.M.A. 298, 38 C.M.R. 96 (1967).

■ That the accused was in a custodial situation on June 25 appears to have been assumed at trial. Whatever his situation, he was properly advised of his rights under *Miranda* and *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967). Lacadie testified the accused was explicitly informed "he did not have to give it to us," and the accused admitted he had agreed to turn over the weapon. The reasons the accused gave are inconsistent. At one point, he maintained, as previously noted, that he believed he had no "choice but to give it to them." Elsewhere in his testimony, he stated he was told that the rifle was

2. Lacadie's notes of the interview, which were admitted as an appellate exhibit, confirm that the accused "advised that he was *willing* to give us the rifle." (Emphasis added.)

wanted so he "could be eliminated as a suspect," and he insisted he construed this request as a "promise" that if he gave the agents the weapon he would be eliminated as a suspect.[3] Considering the totality of the circumstances as to the surrender of the rifle, I am satisfied that the trial judge was justified in concluding the accused voluntarily consented to give the weapon to the agents.

Between surrender of the rifle on June 25 and June 28, the accused apparently had no encounter with the police. At about 1:00 a. m. on the 28th, he was arrested and lodged in a civilian jail on a civilian warrant, which was issued on the basis, among other things, of the ballistics test results. In the afternoon, the accused was released to the military. As he had requested military counsel, Lacadie arranged for him to consult with Captain Cavallucci, a military lawyer, in one of the interview rooms at the OSI office.

■ The accused and Captain Cavallucci talked for "a very short time." According to the accused, he did not "particularly" want to talk to Cavallucci, and he told him he desired two military attorneys who were at Myrtle Beach. When Cavallucci left the accused, he was confronted by Lacadie and Keller and asked if the accused "was willing to talk to us." Receiving a negative reply, Lacadie asked Cavallucci "if we could have Sergeant Collier tell us that." Lacadie maintained his remark was prompted by "OSI policy," which was "to have the subject himself advise" the agents that "he doesn't want to make a statement."[4] Captain Cavallucci replied, "Sure, go on in." At the same time, he apprised the agents

that the accused had requested "a couple of lawyers from Myrtle Beach." What followed is differently recalled by Keller and Lacadie.

Lacadie testified that after the accused was advised of his rights, he indicated he did not want to talk to them, but would "probably talk" after he "talk[ed] to . . [his] lawyers." From the use of the plural noun, Lacadie inferred the accused meant the lawyers from Myrtle Beach. After the accused made the statement, Keller "took down some data" of the accused's background for his "forms, and we terminated the interview immediately and stepped out." As related by Keller, the sequence of events was different. He stated that, when advised of his rights, the accused replied he "didn't want to make a statement." Keller then proceeded to take "some personal history" data from the accused for his records. After recording the data, the agents left the room, but, recalling that he had omitted a question as to the accused's family, Keller returned. He asked the accused whether he "had any children," and said, "I understood he had asked for two attorneys and I asked if once he had an opportunity to talk to his attorneys would he be willing to talk to me."

As the accused made no statement, we need not determine the effect, if any, of Keller's elicitation of information from the accused after he had asserted his right to silence. But, the differences between Keller and Lacadie in regard to this interview bear significantly upon the differences in their testimony as to the interview on June 29, which produced the incriminating statement that is now in issue.

---

**3.** Whether the request for the rifle included language capable of being construed as a promise like the one alleged by the accused is a different question from whether the accused voluntarily consented to surrender the weapon. The accused's testimony as to his interpretation of the request reflects a state of mind more consistent with a deliberate decision to turn over the weapon than with mere acquiescence in a claim of authority on the part of the agents to obtain it from the accused, irrespective of his consent.

**4.** Although appellate defense counsel in their brief refer to the policy and describe it as a

"subterfuge" to subject the accused to an unwanted meeting with the agents, we are not advised as to the source of the alleged policy. Independent research has disclosed no written instruction or regulation referring to such policy. It has been suggested that the matter might be part of a standard classroom lesson included in training sessions for agents. *See United States v. Enloe*, 15 U.S.C.M.A. 256, 35 C.M.R. 228 (1965). If such policy exists, it is subject to condemnation and should be rescinded.

■ About 4:00 p. m. on June 29, Lacadie and Keller visited the base confinement facility to interview the accused. Before the visit, Lacadie called Captain Cavallucci to ask "if it was all right" to talk to the accused and he said, "Yes." Why Captain Cavallucci gave his consent is not apparent from the record. It is clear, however, that Captain Cavallucci either was not as perceptive as Lacadie regarding the accused's emotional state, or Lacadie had seen him "[a] lot more" than Captain Cavallucci, as the accused testified, and was better able to judge the accused's condition. That condition provided the principal reason Lacadie gave for wanting to interview the accused at that time.[5]

Lacadie gave two reasons for wanting to interrogate the accused. First, he said he wanted the interview "[b]ecause previously I personally had gotten the impression he wanted to tell somebody" about the offenses. The second reason was because of the accused's remark on June 28 that he "would probably talk to us after he had talked to his lawyers." The purported second reason is puzzling. Lacadie had learned that the two lawyers from Myrtle Beach, specially requested by the accused, "were not available." He had to know, therefore, that the precondition set by the accused to his consent to interrogation had not been met. Necessarily, Lacadie had to anticipate that the accused would not agree

to being questioned. Thus, the paramount reason to reinterview the accused before he acquired permanent counsel was Lacadie's deduction that the accused was in such a mental or emotional state as to be impelled "to tell somebody" about the shooting.

In earlier testimony, Keller had indicated that the reason for a particular interview had an important effect upon the way in which he conducted an interrogation. He stated that, while the accused had unqualifiedly agreed to talk at the meeting on June 25 and had turned over his rifle, the accused was not asked any question as to his implication in the offenses "[b]ecause that wasn't the purpose of the interview." The preeminent reason for the June 29 interview provides a unique standard by which to measure the differences in the testimony of Keller and Lacadie as to the conduct of that interview.

Both agents agree that, at the outset of the interview, the accused was informed Captain Cavallucci was aware they had come to question him. They also agree that the accused was asked whether he knew the lawyers he had requested were no longer in the service, and he acknowledged that he did. Further, they are in accord that, when informed of his right to counsel, the accused said he did not "want counsel present." Beyond these aspects of the interrogation, their testimony is significantly different.

5. The Supreme Court has described the "custodial interrogation" as being inherently coercive and as constituting a critical stage of the proceedings against an accused. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). One would suppose, therefore, that the natural inclination of a lawyer, whose client is in jail and about to be questioned by two agents, who have already obtained damaging evidence from him when not represented by counsel, would at least insist upon being present at the interview. We recognize, however, that counsel's insistence on being present at a police confrontation with a client is neither automatic nor universal. *See United States v. Melville*, 8 U.S.C.M.A. 597, 25 C.M.R. 101 (1958). It may be that Captain Cavallucci was prompted to consent by Lacadie's earlier representation that OSI policy required a suspect, personally, to declare his refusal to be interrogated. It has been suggested that Captain Cavallucci's consent was not required, and the

agents could have gone to see the accused without notice to Cavallucci. A number of courts have condemned such a course of action without, however, deeming it a denial of the accused's right to counsel, so long as the accused was properly advised he had a right to the presence of counsel and he voluntarily elected to proceed. *United States v. Cobbs*, 481 F.2d 196 (3rd Cir. 1973), *cert. denied*, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973), and cases cited. This Court has reached the same result. *United States v. Flack*, 20 U.S.C.M.A. 201, 43 C.M.R. 41 (1970). It may be that the practice is out of step with current thought, but we need not explore the matter. Cavallucci was informed about the meeting, and voiced no desire to be present; the accused was informed of the notice to his attorney, and agreed that he need not be present. Consequently, however strictly I might view the situation, the accused's right to counsel was not impaired or undercut.

The first material difference is as to the nature of the accused's answer when asked whether he was willing to talk. Lacadie testified the accused's "answer was, 'I don't want to make any written statements, however I do have a couple of questions I would like to ask you.'" When expressly asked whether the accused "did . . . consent to answer questions as well," Lacadie replied, "He didn't say he would answer; he said he didn't want to make any written statements but that he had a couple of questions." Pressed by trial counsel as to whether the accused "did indicate he would talk to you," Lacadie answered, "Yes." He was not asked, and never explained, what the accused's indication was. Consideration of all three of Lacadie's replies, however, demonstrates that the indication consisted of the quoted responses by the accused. As related by Lacadie, therefore, the accused manifested a willingness only to obtain answers to questions he wanted to ask the agents. Keller's testimony is much more expansive. He maintained the accused "said he was willing to talk, but he didn't want to make a written statement." Thus, according to Keller, the accused affirmatively agreed to talk to the agents, without limitation as to the subject matter.

A second important difference between Keller and Lacadie is as to what occurred immediately after they answered the accused's questions.[6] Keller testified, "We proceeded to talk to him with reference to the events on the morning of the 24th." Asked by trial counsel to "tell the court exactly how that conversation went," Keller replied, "We were discussing the case . . . [when the accused made an incriminating response to a question.]" Lacadie made a lengthy statement, the first sentence of which was, "Mr. Keller and I didn't ask him any questions for a long period of time"; we shall refer to the remainder later. It suffices to observe that the quoted portion of Lacadie's statement leaves no doubt the accused did not participate in the conversation or discussion by the agents, as implied by Keller.

Beyond those mentioned, a columnar presentation of the respective conflicts and agreements between Keller and Lacadie is unnecessary. Lacadie's testimony is more detailed than Keller's and provides a better picture of the course of the interrogation. Accordingly, from the point of his answer to the accused's last question, we set out his testimony, with interposition of appropriate testimony by Keller and the accused.

Q. What did you then do?

A. Mr. Keller and I didn't ask him any questions for a long period of time;[7] [Keller admitted that "before . . . [the accused] made any admissions," he remembered talking to accused about his "wife's involvement"; that she was a suspect and that "we were looking into that matter," but he maintained that was "as much of the specific details as . . . [he could] remember about the subject." The accused testified that Keller announced that "one of the main reasons they wanted to talk" to him was they were "undecided about the disposition of . . . [his] wife"; from Keller's remarks, he "got the impression" that if he "made statements," the charges would be brought against him, not his wife. Lacadie admitted he told the accused about the ballistic tests and urged him to "[g]o ahead and tell us about everything." However, Lacadie maintained he was "not sure" if that "was done at the beginning of the interview or . . . during the interview." He also did not "recall any response" by the [accused.] We just told him we had reviewed his records and talked to people here at Seymour Johnson, we told him we were aware he was a staff sergeant with three years of service; that he was a sharp troop, had never done anything wrong, had an unblemished record, a great record; that he presents himself very militarily, and the Chester Collier we knew now was not the Chester Collier that walked in the hospital that morning. I said, "There is some-

---

6. The agents differed even as to the questions asked by the accused.

7. The interval lasted about 1 hour 15 minutes.

thing more to it; there has got to be something more involved to make you walk in, based on what we know about you." We knew about the baby at Myrtle Beach.

Q. Relate to us as best you can exactly how you proceeded in the interview.

A. I said, "We are aware you had a baby that died in the hospital at Myrtle Beach in January 71, I believe—I am not sure of the date—we know it has been eating at you; it must. I know how you must feel, and especially on that Sunday morning when you went to the hospital feeling bad, hadn't slept, probably all tensed up; you had a fever; you went out there and sat down and knew you were really sick and they wouldn't wait on you, and you couldn't bear it any longer, so you went home and got the gun and started shooting." And Mr. Keller said, "It all started with the baby, didn't it, Chester?", and his reply was yes. [Keller admitted he told the accused he had had courses in psychology. He described his question to the accused about the baby as follows: "I asked the Sergeant if the circumstances that occurred didn't relate directly back to the death of his infant child and did he not feel like possibly the same sort of situation had occurred at the hospital that preceding Sunday morning was the same sort of thing that led to the death of his child, and he said yes, that was the reason behind it, and he proceeded to tell us what occurred."]

Q. Then what happened?

A. Then I asked him if he would like to tell us about it. [Keller admitted, "Just as he started to relate those events that occurred on Sunday morning, the 24th of June," he observed a change in accused's appearance; he described the change as follows: "He appeared to be a little nervous, a little more nervous." Lacadie testified that the accused's "whole body was vibrating"; the phenomenon "upset" him "for a minute."] [8]

Determination of the accuracy and the weight of the testimony of each witness is for the trier of the facts. On review of a record of conviction, this Court will not reassess that determination, although it may be convinced that the testimony of a particular witness is inconsistent, inaccurate, or evasive. In their brief, Government counsel advance this principle, exemplified in many cases, to support their contention that the findings of fact as to the voluntariness of the accused's confession, implicit in the trial judge's ruling admitting the confession into evidence, should not be disturbed. The argument is framed in terms of the conflict between the accused's testimony and that of the agents. Disregard of all the accused's testimony still leaves the differences between Keller and Lacadie. What we are dealing with is not conflict between a Government witness and a defense witness, but conflict in the testimony of the Government's own witnesses.

The burden of proof of essential facts rests upon the Government. When a Government witness testifies one way and a second testifies oppositely, or in substantial contradiction, in the absence of other circumstances, it can hardly be said that the Government has met its burden of proof as to the facts to which the witnesses are in disagreement. See United States v. McNamara, 7 U.S.C.M.A. 575, 23 C.M.R. 39 (1957).

Proper advice to an accused of his right to remain silent and his right to counsel and his voluntary surrender of those rights do not guarantee that a statement obtained from him during the ensuing interrogation is also voluntary. The totality of the interchange must be considered. United States v. Walker, 9 U.S.C.M.A. 187, 25 C.M.R. 449 (1958). Here, the agents' remarks about the "involvement" of the accused's wife and the uncertainty about whether to prosecute her; the reference to

8. The accused made a long statement admitting the offenses. It should be observed that the quoted testimony contains no reference to the June 24 interrogation. The view I take of the interrogation on June 29 makes it unnecessary to consider the impact, if any, of the earlier interrogation.

the ballistics tests and the entreaty that he "tell . . . everything"; and, the reminder to the accused of his emotional and mental state when his baby died, all had the natural and probable effect of eroding the accused's will to remain silent. Even the trial judge perceived that what the agents were doing to the accused was "preparing him" for confession.

 Conceding the Government the benefit of every inference and possible reconciliation of the conflicts in testimony, the record still leaves me unconvinced that the accused's incriminating response to the emotion-laden matters paraded before him for more than an hour was the result of his free and unfettered decision to speak. In short, the Government failed to meet its burden of proving accused's statement was voluntary. *Id.* at 190, 25 C.M.R. at 452. The statement should have been excluded from evidence.

The decision of the United States Air Force Court of Military Review is reversed, and the findings of guilty and the sentence are set aside. A rehearing may be ordered.

Senior Judge FERGUSON concurs in the result.

FLETCHER, Chief Judge (concurring in the result):

I concur in the result reached in the principal opinion. With regard to whether the June 24 interview tainted the subsequent interrogations, see my opinion in *United States v. Seay,* 1 M.J. 201 (1975).