# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

## No. ACM 39638

———————————

## UNITED STATES
*Appellee*

v.

## Ross P. ESCOBAR
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 18 June 2020

———————————

*Military Judge:* Jefferson B. Brown (arraignment); Bradley A. Morris.

*Approved sentence:* Dishonorable discharge, confinement for 2 years, reduction to E-1, and forfeiture of $800.00 pay per month for 2 years. Sentence adjudged 28 October 2018 by GCM convened at Minot Air Force Base, North Dakota.

*For Appellant:* Captain M. Dedra Campbell, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Captain Kelsey B. Shust, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and RAMÍREZ, *Appellate Military Judges.*

Judge RAMÍREZ delivered the opinion of the court, in which Chief Judge J. JOHNSON and Judge POSCH joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

RAMÍREZ, Judge:

A general court-martial composed of a military judge sitting alone found Appellant guilty, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] He was found not guilty of two specifications of dereliction of duty in violation of Article 92, UCMJ, 10 U.S.C. § 892. The military judge sentenced Appellant to a dishonorable discharge, confinement for two years, reduction to the grade of E-1, and forfeiture of $800.00 pay per month for two years. The convening authority approved the adjudged sentence.

Appellant raises two issues on appeal: (1) whether the sexual assault conviction is legally and factually sufficient, and (2) whether the military judge abused his discretion by admitting evidence of an uncharged sexual assault to show propensity under Mil. R. Evid. 413 to prove the charged sexual assault. Finding no error, we affirm.

## I. BACKGROUND

### A. Sexual Assault of Airman First Class PM

Airman First Class (A1C)[2] PM enlisted in the Air Force in August 2015 when he was 19 years old. He arrived at his first duty station at Minot Air Force Base (AFB), North Dakota, where a flight chief introduced him to his supervisor, Appellant. On duty, A1C PM and Appellant would ride together in the same truck, going to and from jobs and would pick up tools or aircraft generation equipment. A1C PM described his initial impression of Appellant as a nice and helpful supervisor.

In June of 2016, while Appellant was assigned on temporary duty (TDY) to an installation in England, Appellant contacted A1C PM and invited him to Appellant's house once Appellant returned to Minot AFB. A1C PM agreed though he had never socialized with Appellant or been to Appellant's house. Appellant offered they could drink and get to know each other better, and A1C PM testified he was "excited" to receive Appellant's invitation.

A1C PM had been assigned to work mid-shift, from 2330 to 0800 hours, for about two to three weeks when Appellant returned from his TDY. On 28 June 2016, after completing his shift, A1C PM went to his dorm room, changed into civilian clothes, and drove to Appellant's house. He would later recall eating little more than a meal at midnight and a pastry at 0300 during his shift, which

---

[1] All references in this opinion to the Uniform Code of Military Justice, Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] At the time of the incident in question, A1C PM held the rank of Airman (E-2).

was the last time he ate before the incident in question. A1C PM was scheduled to return to work in the evening that same day.

A1C PM arrived at Appellant's house between 0930 and 1000 hours. Appellant met A1C PM in his garage and they drove together in Appellant's vehicle to a gas station to purchase alcohol. Because A1C PM was underage, Appellant purchased a 1.75 liter bottle of whiskey and some soda. On the drive back, Appellant told A1C PM that while he was in England, Appellant was lying in bed and woke up to one of Appellant's friends performing oral sex on him, and that Appellant was "okay" with it. Appellant also described an occasion when Appellant watched his friends having sex at a party. A1C PM testified the conversation made him very uncomfortable, but he "just smiled and shrugged it off" and did not tell Appellant that the conversation made him uncomfortable.

When they returned to Appellant's house, Appellant gave A1C PM a tour of his house, put on a movie, and prepared mixed drinks with the alcohol Appellant bought at the gas station. Throughout the day, Appellant told A1C PM more stories about his sexual encounters with friends in England while encouraging A1C PM to drink, and eventually they both finished the bottle of whiskey. A1C PM recalled drinking at least three strong mixed drinks that Appellant prepared, but he did not consider himself an experienced drinker and had never before consumed the types of drinks Appellant prepared, much less the amount of alcohol A1C PM consumed.

At one point, Appellant went to use the bathroom and invited A1C PM to join him. A1C PM stood up from Appellant's couch and was "[p]retty tipsy" and "sluggish," testifying he felt "[l]ike when you stand up and everything kind of moves a little bit." He explained he had consumed alcohol past the point where he felt he could drive home safely. As they urinated in the toilet together with their penises exposed, Appellant commented, "damn [A1C PM] . . . [n]ice dick" or words to that effect. A1C PM found this weird and "laughed it off" because Appellant's statement made him uncomfortable. A1C PM recalled drinking after the restroom incident but testified that he experienced gaps in his memory. He explained, "I know I was at point A. I know I was at point B," and yet "I can't remember the time in between" because "[m]y memory was very sporadic."

A1C PM recalled leaving the bathroom and returning to the living room couch. His next memory was sitting on the edge of a bed in Appellant's guest bedroom upstairs, still clothed, and with his feet off of the floor. A1C PM was sobbing and felt depressed. Although he could not recall at trial why he was so emotional, he did recall that Appellant was on his left side comforting him using a feminine voice that was not Appellant's normal tone of voice. On cross-

examination, A1C PM explained he was "really upset and depressed," because he would "never be good enough" and "d[id]n't feel loved."

Toward the end of Appellant's consoling of A1C PM, A1C PM recalled using his left arm in a "subdued pushback" of Appellant to indicate he wanted Appellant to stop kissing him, "[b]ut it wasn't very powerful, so it didn't really stop anything." Though A1C PM cannot recall how the kissing started, on cross-examination A1C PM thought he kissed Appellant back, acknowledging he thought the two were "French kissing" and "making out" even though A1C PM "didn't want to" and "didn't really like it." He "remember[ed] kissing and then [he] blacked out."

As before, A1C PM could not recall how much time had elapsed but next recalled sitting on the side of the bed, still in Appellant's guest room. This time he was closer to the edge of the bed, his feet were touching the floor, and he was naked from the waist down. A1C PM testified that as his memory came to, his penis was in Appellant's mouth, and Appellant "was giving [him] oral." A1C PM explained, "I remember at some point putting up some kind of resistance but I don't know[,]" and "I wanted it to stop but I just couldn't make it stop." A1C PM's memory went out again, and he next recalled standing naked behind Appellant with his penis near Appellant's buttocks. Then his memory went out again.

A1C PM next recalled walking from the guest bedroom across the hall to Appellant's room, looking down at himself, realizing he was naked, feeling "so weird," and not knowing why he was walking. Then his memory went out again. A1C PM remembered waking up in Appellant's bed with Appellant next to him, but he had no memory of laying down. A1C PM explained that as he woke up, Appellant was playing "footsies" with him and using Appellant's foot to caress his own. A1C PM pulled his foot away and asked Appellant "why are you doing that?" Although A1C PM could not remember the dialogue, they began to talk, and then Appellant put his head in A1C PM's lap, which made A1C PM "super-uncomfortable." A1C PM asked Appellant, "why is your head in my lap?" and "why are you doing that?" which prompted Appellant to stop.

A1C PM testified he had never been as drunk as he was when he was at Appellant's house. Between 2230 to 2300 hours, A1C PM still felt drunk and wanted to leave because he "needed to get out" even though he was drowsy and "intoxicated." Both A1C PM and Appellant knew that A1C PM was scheduled to work and had to arrive at his unit before midnight. Appellant called the Aircraft Maintenance Unit and let them know that A1C PM would be late or would not be in at all. Although A1C PM did not feel sober enough to drive a vehicle, he drove his jeep from Appellant's house to Minot AFB because he "d[id]n't want to be [t]here anymore" and did not want to be late for work.

Unbeknownst to A1C PM, the Security Forces at Minot AFB had received a tip of a drunk driver in a vehicle matching the description of A1C PM's vehicle. Security Forces personnel were waiting for A1C PM at the gate where he was apprehended for suspicion of driving while intoxicated. A1C PM submitted to a breathalyzer test after being apprehended. At 0011 hours his blood alcohol content (BAC)[3] measured at 0.107 and five minutes later his BAC level was 0.118. A1C PM received nonjudicial punishment for this.

After the Government rested, the Defense called Dr. TL as an expert witness in the field of forensic toxicology, who was qualified as expert on the effects of alcohol on the human body. Dr. TL testified that the alcohol elimination rate is approximately 0.01 to 0.02 per hour. Dr. TL went on to clarify that it would take five or more hours for the average person to go from a BAC of 0.3 to a 0.2, and another five hours (or ten hours total) to get to a 0.1, and a full 15 hours to get to 0. Dr. TL also explained that for most people at a BAC of 0.3, they are unable to walk, incoherent, and a step right before unconsciousness.[4]

A1C PM did not initially report the incident that gave rise to the charges in this case. Instead, A1C PM spoke with Appellant about the incident, and Appellant assured him that it would not happen to anyone else. However, shortly before A1C PM reported what happened to him, he heard from another person in the squadron. In speaking with this person, A1C PM had reason to believe that a similar incident happened with another Airman after A1C PM's incident with Appellant, and A1C PM felt responsible. It was this concern that led A1C PM to report Appellant's conduct.

## B. The Prior Sexual Assault under Mil. R. Evid. 413

BK enlisted in the Air Force in April of 2008. Although he and Appellant met during technical training in Texas, they were in different schools and had very little interaction. In September of 2011, while BK was stationed in England, he was informed through a mutual friend, Technical Sergeant (TSgt) AD, that Appellant was visiting. BK, TSgt AD, and Appellant decided to go out drinking at a nearby pub. BK was 23 years old at the time.

---

[3] Pursuant to Mil. R. Evid. 201(b)(2) we take judicial notice that BAC (Blood Alcohol Content) refers to the percent of alcohol in a person's blood stream. A BAC of 0.10 percent means that an individual's blood supply contains "one part alcohol for every 1,000 parts blood." Office of Alcohol and Policy Education, *The Buzz on the Buzz: What is BAC?*, Stanford Univ., https://alcohol.stanford.edu/alcohol-drug-info/buzz-buzz/what-bac (last visited May 21, 2020).

[4] The BAC of .3 is taken from the trial testimony and reflects a time/BAC computation starting with the A1C PM's known BAC (0.107) at a known time (0011 hours), along with the time A1C PM started drinking, and the amount A1C PM was drinking.

While they were drinking, Appellant asked BK sexual questions. Although BK could not recall verbatim the questions that Appellant was asking him, he did recall the nature of the conversation being sexual. BK testified Appellant asked "if I was gay or if I'd ever considered being with a male. If I'd ever thought about being bisexual." BK put Appellant on notice he was "straight as an arrow." TSgt AD was in the vicinity of Appellant and BK, but he was not at the table when Appellant was questioning BK about his sexual orientation. BK found Appellant's questions "were weird" and made him uncomfortable. Later that night, Appellant put his arm around BK, but it was not "a typical bro-type hug" and BK "kind of brushed it off." This stood out to BK because as he explained "[i]t followed some very probing questions about my lifestyle." Appellant put his arm around BK very soon after Appellant asked BK the sexually-charged questions. BK explained that it was at this point that he "was putting two and two together that this was a little awkward" for BK. BK was not comfortable with Appellant's arm being around him. While they were out, BK drank between seven and nine alcoholic drinks.

After the pub, the three Airmen took a cab to TSgt AD's house to sleep. TSgt AD went to his own room, which left a sectional couch for BK and Appellant to share. The couch had a long side and a short side. BK slept on the long side and Appellant slept on the short side. BK testified that when he laid down, he was still fully dressed in the clothes he wore that evening, including a pair of khaki pants and socks. Before falling asleep, BK recalled that Appellant was playing with BK's feet.

During the night, BK woke up to find that his penis was outside of his pants, and Appellant was near BK on his knees. BK was shocked and asked Appellant, "What the f**k are you doing?" Appellant then darted into the kitchen and possibly exited the residence using a back door because that was the last BK saw of Appellant. BK immediately called the Sexual Assault Response Coordinator, who instructed BK not to shower or change clothes and to be ready to be picked up. BK agreed to a sexual assault forensic examination (SAFE), which included swabs of his penis to gather evidence of any DNA foreign to his own that might be present on parts of BK's body. As a result of the incident, BK sought counseling, and sought advice from a chaplain, his parents, and TSgt AD before deciding to file a restricted report of sexual assault. BK separated from the Air Force in October 2014 without changing his restricted report to unrestricted.

Approximately five years after BK's incident with Appellant, TSgt AD contacted BK to share the allegations in A1C PM's case. While presumably the information TSgt AD provided to BK was hearsay and incomplete, TSgt AD asked BK if he would be willing to speak with an agent of the Air Force Office of Special Investigations about his experience with Appellant. As a result of

this conversation, BK decided to disclose to military investigators the restricted report he made of the incident with Appellant that happened in September of 2011.

Prior to trial, the Government conducted forensic testing of the evidence collected during BK's SAFE. Doctor (Dr.) DW, a forensic biologist at the Defense Forensic Science Center, U.S. Army Criminal Investigation Laboratory, determined that Appellant's DNA had been present on BK's penis to a scientific certainty that was "one quintillion times more likely if it originated from [Appellant] then if it originated from an unknown" source. At trial, Appellant did not challenge that it was his DNA that was tested. However, Dr. DW did explain a concept called "secondary transfer." Dr. DW explained, "A secondary transfer would be if you came into contact with an individual and then you were to touch a second object. And then that second object is what's tested for DNA. So there's an intermediary step between person one's DNA and finding that person on a different object." When Dr. DW was asked to provide an opinion as to whether transfer DNA occurred in this case – that is, BK had Appellant's DNA on his hand from earlier in the night, then BK touched his own penis – Dr. DW explained, "in this case the only DNA profile I detected in this sample was that of [Appellant]. I did not detect any of [BK's] own DNA which I would not expect in a secondary transfer event."

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humphreys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

"The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the court is convinced of the accused's guilt beyond a reasonable

doubt." *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (citation and internal quotation marks omitted). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "The term reasonable doubt . . . does not mean that the evidence must be free from conflict." *Id*. (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)).

In Appellant's case, the elements of the specification of the charge of sexual assault in violation of Article 120, UCMJ, included the following: (1) that at or near Minot, North Dakota, on or about 28 June 2016, Appellant committed a sexual act upon A1C PM by causing A1C PM's penis to penetrate the mouth of the Appellant; (2) that A1C PM was incapable of consenting to the sexual act due to impairment by alcohol; and (3) that Appellant knew or reasonably should have known A1C PM was incapable of consenting. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(3)(f).

> The term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.

*MCM,* pt. VI, ¶ 45.a.(g)(8)(A).

"Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions." *MCM,* pt. IV, ¶ 45.a.(g)(8)(C).

A "person who is substantially incapable of appraising the nature of the sexual conduct due to impairment or unconsciousness resulting from consumption of alcohol cannot consent." *United States v. Prather*, 69 M.J. 338, 342–43 (C.A.A.F. 2011) (citation omitted). "Consent requires a freely given agreement by a competent person." *Id*. at 343. Further, a person is "incapable of consenting" when that person lacks "the cognitive ability to appreciate the sexual conduct in question or [lacks] the physical or mental ability to make and to communicate a decision about whether they agreed to the conduct." *United States*

*v. Pease*, 75 M.J. 180, 185 (C.A.A.F. 2016) (internal quotation marks and citation omitted). Additionally, "a person can be awake and conscious and still be incapable of consenting." *United States v. Bailey*, 77 M.J. 11, 14 (C.A.A.F. 2017) (citing *Pease*, 75 M.J. at 186) .

Generally,

> it is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense. If the ignorance or mistake goes to an element requiring premeditation, specific intent, willfulness, or knowledge of a particular fact, the ignorance or mistake need only have existed in the mind of the accused. If the ignorance or mistake goes to any other element requiring general intent or knowledge, the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances. However, if the accused's knowledge or intent is immaterial as to an element, then ignorance or mistake is not a defense.

Rule for Courts-Martial 916(j)(1).

Mistake of fact was an affirmative defense available in this case, which required Appellant to have an honest and reasonable mistake of fact as to A1C PM consenting to the oral sex. *See United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019). "For the defense of mistake of fact to exist, the ignorance or mistake of fact must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id.* (internal quotation marks and citation omitted).

**2. Analysis**

The Government, in Charge I and its Specification, alleged that Appellant, on or about 28 June 2016, committed a sexual act upon A1C PM by causing A1C PM's penis to penetrate the mouth of Appellant, when A1C PM was incapable of consenting to the sexual act due to impairment by alcohol, and that condition was known or reasonably should have been known by Appellant, in violation of Article 120, UCMJ.

In attacking the sufficiency of the evidence to support his conviction, Appellant takes the same two-pronged approach he did at trial. First, Appellant argues that A1C PM consented to the sexual activity because A1C PM was not so intoxicated that he was incapable of consenting. Second, and in the alternative, Appellant argues the evidence shows he labored under a mistaken belief as to consent. We disagree.

As explained in detail below, and after drawing every reasonable inference from the evidence in the record in favor of the Government, the court finds a reasonable factfinder could have found all the essential elements were met, and that the Government disproved the defense of mistake of fact as to consent beyond a reasonable doubt. Additionally, after taking a fresh, impartial look at the evidence, applying neither a presumption of innocence nor a presumption of guilt to make our own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt, and after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

### a. Victim's Inability to Consent

Appellant argues that A1C PM, even if intoxicated, was capable of consenting and was in control of his mental and physical faculties. However, the evidence at trial was contrary to this position. A1C PM was 20 years old and, although he had previously consumed alcohol, he was not an experienced drinker. He had never had those particular mixed drinks before, and he had never felt as drunk as he did on the afternoon of the incident in question. Additionally, it was Appellant who prepared the drinks, and it was Appellant who encouraged A1C PM to drink and to continue drinking.

As to A1C PM's level of intoxication at the time of the oral sex, A1C PM testified that he started drinking at some point after 1000 hours, and a breathalyzer test administered to A1C PM shortly after midnight reported his BAC was at least .107. From the expert's testimony, a factfinder could reasonably conclude that even accounting for a faster alcohol elimination rate, A1C PM had a very high BAC at the time of the assault.

Here, A1C PM's effects from the alcohol began as him feeling "pretty tipsy" and "sluggish," to having everything move when he stood up. Then he experienced gaps in his memory. While A1C PM described his memory as not knowing what would happen "between point A and point B" and that his memory was "very sporadic throughout;" he found himself at one point sobbing and not knowing why; and recalled things like walking from one room to another and feeling "weird" and not knowing why he was walking; he was clear as to what he saw, felt, and experienced. From the testimony, a factfinder could reasonably conclude that A1C PM's lack of recall was due to the large amounts of alcohol he had consumed.

While Appellant argues that there is *no* evidence that A1C PM was passed out or unconscious while receiving oral sex, and in a similar vein contends that A1C PM was coherently communicating immediately before the oral sex and

was actively participating in sexual activity, A1C PM's testimony directly contradicts this position. By the time A1C PM's memory comes back to him, Appellant already had A1C PM's penis in his mouth. As to whether A1C PM was communicating before the oral sex, there is nothing in the record that he communicated consent. Based on his testimony about his confusion as to what was happening and his inability to respond to prevent unwanted acts from occurring, a rational factfinder could conclude that the reason was because A1C PM was too intoxicated to effectuate consent.

Appellant cites *United States v. Nicely*, No. ACM 36730, 2007 CCA LEXIS 322, at \*4, \*9–10 (A.F. Ct. Crim. App. 15 Aug. 2007) (unpub. op.) for the proposition that this court found the named victim capable of consenting even though she was intoxicated and did not remember having sexual intercourse with the accused. Appellant quotes this court in explaining that a "lack of memory does not always equate to a lack of consent." Appellant's reliance on *Nicely* is misplaced. While the quote is correct, in *Nicely*, there were observers to the sexual encounter who could speak to the objective actions of the named victim and the accused, which indicated the named victim was a "consenting and willing participant." *Id.* at \*2–3, \*9–10. Here, the only testimony before the court was A1C PM's recollections, which indicated he was confused and unwilling, and the scientific evidence as to his BAC levels.

The evidence in the record leads the court to conclude that A1C PM lacked "the cognitive ability to appreciate the sexual conduct in question or [lacked] the physical or mental ability to make and to communicate a decision about whether [A1C PM] agreed to the conduct." *Pease*, 75 M.J. at 185 (internal quotation marks and citation omitted). Since A1C PM was "substantially incapable of appraising the nature of the sexual conduct due to impairment or unconsciousness resulting from consumption of alcohol," he could not consent to the oral sex. *See Prather*, 69 M.J. at 342–43. As such, the court finds that, considering the evidence in the light most favorable to the Prosecution, a reasonable factfinder could have found that the victim was incapable of consenting. Additionally, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the court is convinced of the accused's guilt beyond a reasonable doubt.

### b. Mistake of Fact

Over the Government's objection, and pursuant to trial defense counsel's request, the military judge considered the mistake of fact defense with regards to consent as to the sexual assault offense. Appellant claims that "there was no evidence that [Appellant] should have believed A1C PM was incapable of consenting." Appellant then suggests that there was no testimony that A1C PM was slurring, falling down, vomiting, talking incoherently, or passing out while Appellant was performing oral sex on him. As this is a similar argument

to the one just discussed in this opinion, the court will not reiterate the facts, but notes that these facts could easily lead a factfinder to conclude that it would not be reasonable to believe that a 20-year-old who was highly intoxicated and that had never had any social interaction with Appellant consented to oral sex.

Appellant gives seven reasons why the evidence shows he honestly believed A1C PM consented to the sexual conduct: (1) A1C PM never told Appellant to stop telling him sexually explicit stories, (2) it was A1C PM that exposed his penis to Appellant in the bathroom, (3) A1C PM did not "communicate any discomfort" when Appellant complimented A1C PM's penis, (4) it was A1C PM that told Appellant he did not feel loved, (5) A1C PM did not stop Appellant from kissing him, (6) A1C PM moved into a better position to receive oral sex, and (7) A1C PM had an erection. However, we final a rational factfinder would not be so convinced, and we ourselves are not convinced.

First, A1C PM did not have to tell Appellant to stop telling him sexually explicit stories in order to manifest lack of consent. Simply put, nervous silence in response to inappropriate sexual remarks by one's supervisor cannot reasonably be interpreted as indicating consent. Second, it was Appellant's suggestion to go to the bathroom at the same time, not A1C PM's suggestion. Third, Appellant's assertions are contradicted by A1C PM's testimony. A1C PM was clear that when he realized Appellant was kissing him, he used a subdued pushback with his left arm to try to stop the kissing. There is nothing before the court that would persuade us that Appellant had an honest and reasonable mistake of fact as to A1C PM consenting to the oral sex. It is up to the factfinder to determine which parts of A1C PM's testimony to believe. *See United States v. Collier*, 1 M.J. 358, 366 (C.M.A. 1976) (the determination of the accuracy and the weight of the testimony of any witness is for the factfinder); *United States v. Smith*, 33 M.J. 527, 533 (A.F.C.M.R. 1991) (citations omitted), *aff'd*, 35 M.J. 138 (C.M.A. 1992) (the factfinder has the discretion to determine the appropriate weight to give the evidence). The military judge as the factfinder could rationally conclude that the Government proved beyond a reasonable doubt that Appellant was not reasonably mistaken as to consent.

Considering the evidence in the light most favorable to the Government, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of sexual assault as charged. Furthermore, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient.

**B. Admission of Prior Sexual Assault under Mil. R. Evid. 413.**

**1. Law**

A military judge's decision to admit evidence is reviewed for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation omitted). An abuse of discretion occurs when the reasoning of the military judge is clearly untenable and amounts to a denial of justice. *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987) (citation omitted). In order for this court to reverse a military judge's decision based on an abuse of discretion, we must have far more than a difference of opinion. *Id.* (citation omitted). Instead, this court must find that the military judge's decision or ruling was arbitrary, fanciful, or clearly unreasonable or erroneous. *Id.* (citation omitted).

Mil. R. Evid. 413(a) provides that "[i]n a court-martial proceeding for a sexual offense, the military judge may admit evidence that the accused committed any other sexual offense. The evidence may be considered on any matter to which it is relevant." This includes using evidence of an uncharged sexual assault to prove the accused has a propensity to commit sexual assault. *See United States v. James*, 63 M.J. 217, 220 (C.A.A.F. 2006).

The United States Court of Appeals for the Armed Forces (CAAF) has articulated three "threshold findings" that a military judge must make before admitting evidence under Mil. R. Evid. 413: (1) the accused is charged with an offense of sexual assault; (2) the evidence proffered is evidence of his commission of another sexual assault; and (3) the evidence is relevant under Mil. R. Evid. 401 and 402. *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000). If the findings are found in the affirmative, then the military judge applies a Mil. R. Evid. 403 balancing test. *Id.*

The CAAF has further held that in conducting the Mil. R. Evid. 403 balancing test, a military judge should consider factors such as

> the strength of the proof of the prior act; the probative weight of the evidence; the potential to present less prejudicial evidence; the possible distraction of the fact-finder; the time needed to prove the prior conduct; the temporal proximity of the prior event; the frequency of the acts; the presence of any intervening circumstances; and the relationship between the parties.

*United States v. Berry*, 61 M.J. 91, 95 (C.A.A.F. 2005) (citing *Wright*, 53 M.J. at 482).

**2. Analysis**

At issue on appeal is the military judge's admission under Mil. R. Evid. 413 of Appellant's uncharged sexual assault of BK in September of 2011. Specifically, although Appellant acknowledges that the military judge applied the correct legal test, he argues that the military judge abused his discretion applying the facts to the law. Recognizing that the abuse of discretion standard is a strict one, we find that the military judge reasonably applied the applicable standard

to the facts before him, and the military judge did not abuse his discretion in permitting BK's testimony for the purpose of Mil. R. Evid. 413.

The military judge was the factfinder on the motion, as well as the fact-finder at trial. He issued a written ruling on the Defense's motion in limine to exclude evidence offered under Mil. R. Evid. 413. In the written ruling, the military judge made findings of fact, which we find were not clearly erroneous. Citing *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013), the military judge articulated the correct burden of proof which was that as the proponent of the evidence, the Government had the burden to show the admissibility of the evidence by a preponderance of the evidence. The military judge set forth the correct tests for admissibility under Mil. R. Evid. 413 and Mil. R. Evid. 403. With the facts and the legal standard, the military judge then applied the *Wright* factors and the Mil. R. Evid. 403 balancing test.

The military judge found the uncharged act Appellant committed against BK in September 2011 was evidence under Mil. R. Evid. 413(d)(3) of contact, without consent, between any part of the Appellant's body and BK's genitals. The military judge found that the factfinder could find by a preponderance of the evidence that an offense occurred based on the evidence presented by BK and forensic evidence of DNA obtained from BK and Appellant. Further, the military judge found that the evidence would tend to support the contention that Appellant had demonstrated a propensity to commit sexual assault upon a non-consenting person.

Appellant claims that the military judge abused his discretion as to the second and third *Wright* factors as well as under the Mil. R. Evid. 403 balancing test. Specifically, Appellant first argues that the military judge erroneously concluded Appellant sexually assaulted BK by performing oral sex on him without his consent. Appellant then claims that the military judge erroneously concluded that evidence was relevant to show consent or lack of consent. In Appellant's argument with respect to the third *Wright* factor, he does not elaborate as to how the military judge abused his discretion but simply argues that the probative value of the uncharged misconduct was substantially outweighed by the danger of unfair prejudice pursuant to Mil. R. Evid. 403.

Appellant's arguments as to how the military judge abused his discretion, do not convince us that the military judge's finding was arbitrary, fanciful, or clearly unreasonable or erroneous. *See Travers*, 25 M.J. at 62 (citation omitted). It is clear that Appellant has a difference of opinion with the military judge's findings and conclusions, but this is not sufficient to find that the military judge abused his discretion. Instead, we find the military judge did not abuse his discretion as explained below.

As to the second *Wright* factor, the military judge concluded that BK's testimony and the DNA evidence was sufficient to find that it was evidence under Mil. R. Evid. 413 of contact, without consent, between any part of Appellant's body and BK's genitals, and that a factfinder could find by a preponderance of the evidence that the incident occurred. We agree with the military judge. While there was no testimony of anyone seeing any part of Appellant's body on BK's penis, the evidence provided was strong.

While they were out drinking, Appellant first tested the sexual waters by asking BK if he had ever considered being with a male. After BK told him no in no uncertain terms, Appellant next pushed the issue by asking BK sexual questions, making BK feel uncomfortable. Later in the evening, Appellant put his arm around BK, but it was not "a typical bro-type hug." Then, at the end of the night while Appellant and BK had to sleep on the same couch, BK recalled that Appellant was playing with BK's socked feet. BK fell asleep with all his clothes on, but at some point in the night, BK woke up to find that his penis was outside of his pants, and Appellant was on his knees near him. While BK did not see Appellant sexually assault him, Appellant's DNA was found on BK's penis. This is convincing evidence that a part of Appellant's body was on BK's penis while BK was unable to consent because he was asleep or otherwise unconscious. We find that the military judge did not abuse his discretion as to this factor.

As to the third *Wright* factor, the military judge concluded that the evidence of Appellant sexually assaulting BK was relevant to A1C PM's case under Mil. R. Evid. 401 and 402. The military judge found that the evidence would tend to support the contention that Appellant has demonstrated a propensity to commit sexual assault upon nonconsenting males and that each incident occurred under similar circumstances. We find that the military judge did not abuse his discretion as to this factor.

Although *United States v. Hyppolite*, 79 M.J. 161 (C.A.A.F 2019), was decided on the basis of Mil. R. Evid. 404(b), the CAAF also did a Mil. R. Evid 401 analysis, and we find it instructive as to the third *Wright* factor as it dealt with an accused charged with sexually assaulting more than one victim with common factors in the evidence. The CAAF held that the two military judges addressing the same issue at Hyppolite's court-martial did not abuse their discretion in deciding that the accused had a common plan or scheme to take advantage of sleeping victims who had been drinking, and that evidence of a common plan or scheme was admissible under the rubric of uncharged misconduct. *Id*. at 167. *Hyppolite* dealt with a common plan or scheme where the evidence of each victim shared factors such as the relationship of the victims to the accused, the circumstances surrounding the alleged commission of the offenses,

alcohol, sleeping victims or victims falling asleep, and the nature of the misconduct. *Id*. at 162–63.

Similar to *Hyppolite*, here both incidents involved eight similar characteristics among the victims that relate to victim identity, basis of knowledge between Appellant and victim, alcohol, and memory issues. The similar characteristics between the incidents involving A1C PM and BK include the following: (1) a young male victim 20 to 23 years of age; (2) both victims knew Appellant only through the Air Force; (3) both victims were interacting with Appellant socially for the first time at the time of the wrongdoing; (4) Appellant had sexually-charged conversations with both victims; (5) both victims consumed a significant amount of alcohol; (6) neither victim recalled the beginning of the sexual assault; (7) both victims claimed that Appellant at some point played with their feet; and (8) Appellant performed sexual acts on each victim while the victim was incapable of consenting due to sleep or consumption of alcohol.

Therefore, all three *Wright* factors were met – Appellant was charged with an offense of sexual assault, the evidence proffered was evidence of his commission of another sexual assault; and the evidence was relevant. As to the Mil. R. Evid. 403 balancing test, the military judge took into account legislative intent that evidence of prior sexual offenses should be admissible. The military judge has support in appellate jurisprudence. The CAAF has stated that "inherent in [Mil. R. Evid.] 413 is a general presumption in favor of admission." *Berry*, 61 M.J. at 94–95 (citing *Wright*, 53 M.J. at 482–83). The military judge also took into account the inherent prejudicial effect that this evidence may have upon an accused. The military judge then found that the time between offenses was not too distant and concluded with a full Mil. R. Evid. 403 analysis.

We find the military judge did not abuse his discretion in admitting Appellant's conduct with BK under Mil. R. Evid 413. While such evidence carries a risk of unfair prejudice to an accused, that risk is minimized in a case tried by a military judge who is presumed to know the law and apply it correctly. *See United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citation omitted). With no indication to the contrary, and applying this presumption, we are confident the military judge properly applied the evidence of Appellant sexually assaulting BK.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and the sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court